# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
# (GREENBELT DIVISION)

| | |
|---|---|
| In re ) | |
| ) | |
| **DERRICK STEPHEN SIEBER,** ) | |
| ) | Case No. 20-20702 |
| **Debtor** ) | |
| ) | (Chapter 7) |
| ) | |
| _____ | |
| | |
| **DISTRICT OF COLUMBIA,** ) | |
| 1350 Pennsylvania Avenue, N.W. ) | |
| Washington, D.C.  20004, ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | Adv. Pro. 21- |
| ) | |
| **DERRICK STEPHEN SIEBER,** ) | |
| P.O Box 55023, ) | |
| Washington, DC 20040 ) | |
| ) | |
| **Defendant** ) | |

## COMPLAINT TO DETERMINE DEBT TO BE NON-DISCHARGEABLE

**COMES NOW** Plaintiff the District of Columbia, by and through counsel, the Office of the Attorney General for the District of Columbia, and files its Objection to a discharge of Debtor Derrick Stephen Sieber, pursuant to 11 U.S.C. § 727(a)(4)(A).  Further, Plaintiff the District of Columbia ("District") objects, pursuant to 11 U.S.C. § 523(a)(2), to the discharge of certain debts owed by Debtor, Derrick Stephen Sieber ("Debtor" or "Sieber")which are the subject of litigation in *District of Columbia v. Precision Contracting Solutions, Derrick Stephen Sieber and Stephen Sieber*, Civil Action Nos. 2019-CA-005047 and 2020-CA-001596, civil

proceedings in the Superior Court of the District of Columbia. In support thereof, the District states as follows:

## I. JURISDICTION

(1) This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and 11 U.S.C. § 1104 *et seq.* This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409. This is an adversary proceeding under the provisions of Part VII, Federal Rules of Bankruptcy Procedure.

## II. PARTIES

(2) The District, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States.

(3) Debtor resides in Maryland and has operated a home improvement contracting company named Precision Contracting Solutions, LP ("PCS") since 2007. Debtor Sieber is the general partner and sole proprietorof PCS. Debtor, at all times relevant to this Complaint, has been the owner of PCS, has had managerial authority over PCS, is involved in the day-to-day operations of PCS, is responsible for developing, implementing and/or enacting all of PCS's major operating policies, and formulated, controlled, has had the authority to control, or has participated in the acts and practices set forth in this Complaint.

## III. ACTIONS OF DEBTOR

### A. Background Involving Debtor Derrick Stephen Sieber.

### 1. General Background.

(4) In 2007, Debtor, along with his partner Christopher Petitio, started a home improvement contracting company, PCS. On July 10, 2007, Debtor filed paperwork with the

District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), registering PCS as a limited partnership in the District. While approximately eighteen months after its founding, Christopher Petitio left PCS and the partnership was dissolved, Debtor has continued to operate PCS as the owner and sole proprietor. Since approximately 2008, Debtor has operated PCS with his father, Stephen Sieber.

### a. Debtor's Deceptive Advertising

(5) Between 2007 and 2020, Debtor, through his business PCS, entered into at least 133 contracts with District customers for home improvement and general contracting services. Debtor marketed his services on his business's websites,[1] on yard-signs, and on third-party websites, including HomeAdvisor and Angie's List. On the websites, Debtor advertised that through his business he could "service all construction needs for all types of projects."

(6) The services Debtor, through his business PCS, offered included additions, major home renovations, repairs, and remodeling; kitchen and bathroom remodeling; basement remodeling; building garages; installation of steel beams; metal fabrication; concrete driveway and floor installation; retaining wall installation; installation of concrete patios, walkways and steps; vinyl siding; design and decoration services; water removal and recovery; fire and smoke recovery; and dry-rot, water, or pest damage repair. Debtor represented that he is particularly known for [his] experience in sophisticated structural underpinnings and alterations" and "[his] vast experience with historic homes and architecture."

(7) These representations are false. In fact, Debtor had no education or training in construction. Debtor also did not employ any person, or persons capable of performing the advertised or contracted-for work. Specifically, Debtor never employed any architects,

---

[1] The websites are www.pcsrenovations.com and www.precisioncontractingsolutions.net.

3

designers, engineers, or construction crews, or any individuals other than himself and his father, Stephen Sieber. Rather, Debtor used unlicensed subcontractors and day laborers to perform the work they advertised and were paid to provide. For example, Debtor advertised that he is "particularly known for [his] experience in sophisticated structural underpinnings," when no individual employed by PCS had training in structural underpinnings, and PCS rarely if ever did structural underpinnings.

### b. Debtor's Misrepresentations and Omissions Regarding Permits

(8) Debtor also made misrepresentations and omissions of material fact to consumers regarding the permits associated with the work PCS was hired to perform. Debtor told customers that they would obtain all permits necessary for the project, as required by District law, and deliver all applicable certifications and approvals.[2] Indeed, Debtor was required to obtain permits pursuant to District law.

(9) Despite the requirement to do so, Debtor routinely failed to obtain all permits required by District law. Debtor never disclosed this to his customers. Moreover, Debtor was required to "maintain a list that includes information about all permits obtained . . . on any project permitted or requiring a permit under this chapter." 16 DCMR § 807.3A. Debtor failed to maintain such a list. When Debtor did obtain permits, he did so improperly, misstating or minimizing the scope of work to avoid additional requirements needed for specialty permits. For example, Debtor was hired to renovate a customer's basement and began work on the basement under a building permit that stated "no basement work." As a result of Debtor's failure to obtain the required permits, the construction that Debtor performed was illegal.

---

[2] 17 DCMR § 3907 requires that contractors must "ensure that the work is performed only under the authority of the required permit and in accordance with all of its terms."

4

### c. Debtor's Misrepresentations and Omissions Regarding His Use of Unlicensed Workers.

(10) Debtor further misrepresented and failed to disclose to his customers that he would perform contracted-for work using unlicensed subcontractors and day laborers. He also made determinations about engineering requirements on the project. He advised that a customer's basement did not require underpinning and that certain walls that needed to be moved were not load-bearing. Debtor is not a licensed engineer and the contract specifically called for a D.C. licensed structural engineer to work on the plans. Indeed, nearly all the work Debtor advertised and contracted for was performed by unlicensed subcontractors and day laborers, which he did not disclose to his customers. Although Debtor used licensed professionals to obtain permits for some work, he used unlicensed workers—who are not on the permit and did not work for the licensed individual on the permit—to perform the actual work.

(11) Debtor used unlicensed persons to do the work of general contractors, interior designers, architects, engineers, electricians, and plumbers. For example, Debtor used an unlicensed "general subcontractor" for many projects including steel beam installation, additions and remodeling, concrete driveways and floors, retaining wall installations, disaster recovery services, demolition, carpentry, roofing, and siding.[3] Debtor did not disclose his use of unlicensed subcontractors to his customers, but instead frequently referred to unlicensed subcontractors by professional titles (*e.g.* plumber) that require licenses in the District of Columbia.

---

[3] Under District law, general contractors, architects, interior-designers, engineers, electricians, and plumbers, are required to have a license to offer or render services in connection with those respective fields. See D.C. Code § 47–2851.03d (General Contractor/Construction Manager License); 17 DCMR § 3410 (Scope of Practice of Architecture), 17 DCMR § 1517.5 (Scope of Practice of Engineering), D.C. Code § 47-2853.121 (Scope of Practice for Plumbers or Gasfitters), 17 DCMR § 3209, et al. (Scope of Practice of Interior Design); 17 DCMR § 200, et al. (Electrician License and Bonding).

5

### d. Debtor's Threats and Harassment to Customers and Enforcement of Unconscionable Contract Terms.

(12) When customers raised complaints regarding PCS's construction work, Debtor routinely harassed and threatened them. Debtor threatened, and in some cases filed, arbitration proceedings or other legal actions to intimidate and silence customers. Debtor also made threats to file improper liens against customers. On several occasions, Debtor also threatened to interfere with customers' employment in response to complaints by those customers.

(13) In addition to the threats, Debtor attempted to silence customers by enforcing unconscionable arbitration provisions in their home improvement sales contracts. The arbitration provision in the PCS contract requires that customers bring any claims against Debtor, and his business PCS, within 30 days of a dispute with PCS or the claims are barred from being brought by the parties in any and all legal forums. The arbitration provision also includes a confidentiality clause, requiring customers to keep confidential any disputes that may arise between the parties and the results of any arbitration proceeding. Debtor routinely tried to enforce the arbitration provision, and in particular the confidentiality clause, of the contract, including in one instance threatening to file a Bar complaint against the customers should they disclose their dispute with PCS and in another dispute moving to vacate an arbitration award for alleged violations of the confidentiality clause.

(14) In a federal action brought by a PCS consumer against Debtor's business, the District Court for the District of Columbia held that the arbitration provision of Defendants' contract, including the confidentiality clause, was "unconscionable and in violation of federal law." *Seibert v. Precision Contracting Sols., LP*, CV 18-818 (RMC), 2019 WL 935637, at *10 (D.D.C. Feb. 26, 2019).

## 2. Examples of Consumers Injured by Debtor's Misrepresentations.

(15) In 2015, Debtor contracted with a consumer to remodel a basement. Debtor informed the consumer that no underpinning was required for the project as Debtor had a novel method to structurally reinforce the basement. Debtor continued the basement renovation without underpinning until water began seeping into the consumer's basement. When the consumer contacted DCRA, DCRA's inspection resulted in the issuance of a stop work order. To remediate this dangerous condition, the basement had to be completely dug out, fully underpinned and re-poured, at significant cost to the consumer.

(16) Debtor also has misled consumers about how quickly renovations will be completed. Debtor has represented to consumers that renovation projects will be completed within a few weeks or months. Debtor's contracts also often contain language that requires that a project be completed by a specific date. In reality, Debtor has failed to meet completion dates, taking months or even years longer that what was promised. In some cases, Debtor has totally abandoned projects, even when consumers have paid Debtor the full amounts required in their contracts. Debtor has often left consumers with poorly renovated, partially completed spaces, such as non-functioning kitchens or bathrooms for months on end, that do not have working appliances, fixtures, running water, and HVAC systems.

(17) When renovating consumers' properties, Debtor, through his business PCS, is responsible for ensuring that all work that they offer to perform is conducted only under the authority of required permits issued by DCRA. *See* 16 DCMR § 812. To obtain required permits, Debtors is required to submit building plans to DCRA identifying the construction work that will be performed under the requested permits. Debtor has represented to consumers that he will fulfill all legal requirements of ensuring that the renovation services provided are compliant with

District law, including obtaining any required permits. Debtor, however, often has failed to obtain required permits for renovations and alterations. When Debtor has obtained permits, he has misstated or minimized the scope of work to avoid additional requirements needed to obtain specialty permits. As a result of Debtor's failure to obtain required permits, the construction that Debtor has performed is, in many cases, illegal, has not been approved, and has not been properly inspected as required under D.C. Code §6-1401, et seq., 12 DCMR Title 12 (jointly the "Construction Codes"), and other applicable regulations. Debtor has not disclosed to consumers that he performs renovations without proper permitting, resulting in homes that violate the District's Construction Codes.  For example, in 2015, Debtor contracted to renovate a consumer's basement to create a separate unit with a separate utilities meter.  Debtor represented to the consumer that the cost of the renovation included pulling permits required by the law. Debtor, however, began work on the basement under a building permit that stated "no basement work."

(18) In another example, in 2017, a consumer had a home registered in a historic district. Debtor represented to the consumer that Debtor would file the required plans to get the approvals to renovate the property pursuant to the requirements for historic homes. *See* D.C. Code § 6-1101. Instead, Debtor failed to file any plans and failed to apply for any permits throughout the pendency of the renovation.

(19) Although Debtor uses licensed professionals to obtain permits for the work that he performs, he often uses unlicensed professionals-who are not on the permit and do not work for the licensed professional-to perform the actual work. For example, at one consumer's property, Debtor obtained a plumbing permit in the name of a licensed plumber and then hired an unlicensed plumbing company to perform the work. Debtor does not disclose to consumers that he uses unlicensed professionals to perform specialized work.

(20) Debtor also has represented to consumers that he will provide high-end renovations with custom designs, or high grade and quality materials. In one case, a consumer requested a kitchen renovation with high-end appliances and finishes. Debtor instead provided basic appliances purchased from a large retail store and substandard granite materials, which Debtor still priced at well over two times the average cost of mid-grade granite.

(21) Debtor also has entered into contracts with consumers with language indicating that that the price will not exceed a certain amount. After consumers make payments to Debtor as required by the contract, Debtor has refused to finish the promised scope of work and has demanded additional sums to be paid or has threatened to abandon the project altogether. In 2017, Debtor entered into a contract with a homeowner for a full renovation of their property. Two years later, and after the full sums requested by Debtor had been paid, the consumer was left with an unfinished project and Debtor continued to demand sums far in excess of the initial contract price to complete the project.

(22) Debtor's contracts also use language indicating that payments will be made to Debtor on a set schedule, requiring certain work to be completed prior to payment. In practice, however, Debtor has disregarded these payment schedules. In several instances, Debtor asked a consumer to make additional payments directly to subcontractors for work that should have been performed under the contract with Debtor.  In other cases, Debtor has required consumers to pay deposits early that far exceed the deposit amount required in their contracts.  Debtor has then failed to timely begin work, sometimes not commencing work for weeks or even months after the date he represented PCS was available to start.

(23) In addition, Debtor has also engage in shoddy sub-standard renovation work at jobsites including, but not limited to: failing to properly seal and waterproof basements prior to

painting; installing a downspout on a gutter under a vapor barrier, causing water to enter the residence; leaving access room panels completely uninstalled; improperly installing exterior doors with no flash sealing or caulk; leaving jobsites unsecured resulting in consumers' homes being trespassed and burglarized; and utilizing unlicensed and unskilled tradesmen to perform specialty tasks, such as floor and stair refinishing.

### 3. District of Columbia Filed Lawsuit in Superior Court Asserting Debtor Engaged in False Representations and Omissions that Harmed Consumers.

(24) On July 31, 2019, the District of Columbia filed a complaint in the Superior Court of the District of Columbia (the "Superior Court") against Debtor, his company, Precision Contracting Solutions, and Stephen Sieber, Debtor's father, alleging violations of the District Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, by making material misrepresentations to consumers and violating applicable law in their renovations of residential properties (the "DC AG Action") thereby harming consumers.

### B. Debtor Derrick Sieber Filed for Bankruptcy Protection.

(25) On December 10, 2020, Debtor Sieber filed for protection under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

(26) As of November 30, 2021, a total of seventeen claims had been filed by various creditors. Out of that number, Claim No. 10-1 filed by the District of Columbia was withdrawn as redundant. In addition, Claim No. 3 was filed by the Office of the Comptroller of the Treasury of Maryland for income taxes. Out of a total of fifteen remaining claims, a total of nine claims were filed by eight consumers who were injured by Debtor's false representations and violations of the District's Construction Codes, or more than 50% of the claims filed against

10

Debtor were claims arising from injuries inflicted by Debtor's false representations and actions. *See* Claim Nos. 2, 5, 7, 8, 9, 12, 13, 14, and 17.

**COUNT I**
**DENIAL OF DISCHARGE OF DEBT PURSUANT TO 11 U.S.C. §523(a)(2)(A)**

(27) This is an action to have the debt owed by Debtor Derrick Sieber to the District be excepted from any discharge of Debtor and determined to be non-dischargeable pursuant to the provisions of 11 U.S.C. §523(a)(2) for obtaining money by false pretenses, false representations, or actual fraud.

(28) The District re-alleges and incorporates paragraphs 2 through 26 as if fully stated herein.

**WHEREFORE**, the District of Columbia respectfully moves this Honorable Court to determine that the debt owed by Debtor Derrick Sieber to the District of Columbia is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), and to order such other and further relief as is appropriate in this case.

Date: December 8, 2021.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

DAVID FISHER
Deputy Attorney General

/s/ William Burk
WILLIAM BURK, D.C. Bar No. 325274
Chief, Land Acquisition and Bankruptcy Section

/s/ Nancy L. Alper
NANCY L. ALPER, D.C. Bar No. 411324
Senior Assistant Attorney General
Land Acquisition and Bankruptcy Section
400 6th Street, N.W., 9th Floor
Washington, D.C. 20001
(202) 724-8122
nancy.alper@dc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2021, I caused a copy of the foregoing **District of Columbia's Complaint to Deny Discharge to Debtor and Complaint to Determine Debt to Be Non-Dischargeable** to be filed and served electronically using the Court's ECF System and to be served postage pre-paid by first-class mail by the United States Postal Service to the parties listed on the Mailing Matrix which is attached.

/s/ Nancy L. Alper
Nancy L. Alper